IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JACK SAMUELS,

       Plaintiff,                   No. CIV S-05-2337 GEB JFM P

    vs.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION, et al.,         ORDER AND

       Defendants.          FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is a former[1] state prison inmate proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  The October 26, 2006 motion for summary judgment, filed by defendants Halverson, Schwartz, Stubbs and Popovits, is now before the court.[2]  Plaintiff, a transgender, claims she was improperly denied good time credits, suffered a violation of due process, and was subjected to cruel and unusual punishment and to a hostile work environment because of sexual harassment.

---

   [1] On April 18, 2007, plaintiff filed a change of address with the court, providing an out-of-custody address.

   [2] The court previously found plaintiff's claims against defendants California Department of Corrections and Rehabilitation (CDCR) and the California Medical Facility (CMF) were barred by the Eleventh Amendment.  (December 16, 2005 Order at 2.)

1

UNDISPUTED FACTS

Except as otherwise noted, the following facts are undisputed.

1. Plaintiff was incarcerated at CMF at all times material hereto.

2. Defendants were employed at CMF at all times material hereto; defendant T. Schwartz was Warden, J. Stubbs was a Correctional Counselor and J. Popovits and D. Halverson were Sergeants.

3. On October 14, 2004, plaintiff was interviewed by Dr. Canning, who noted that plaintiff wanted to go to school, but was willing to work. (Defts.' Ex. B-1 at 17.)

4. Plaintiff appeared before the Unit Classification Committee (UCC) on October 14, 2004, for annual review. (Defts.' Ex. A-1 at 4.) The UCC noted that plaintiff was unassigned and on the 700, 900 and 0392 waiting lists. (Id.) At plaintiff's request, plaintiff was added to the 900F (food handling) and 900L (laundry/linen) waiting lists. (Defts.' Ex. A-1 at 4; Ex. C.)

5. On October 25, 2004, plaintiff was beaten by a boyfriend who did not want plaintiff working in the kitchen. (Defts. Ex. B-1 at 2-3.) Plaintiff had swelling to the face, several abrasions to the head and face, and a bruised lip. (Defts.' Ex. B-1 at 2.)

6. Plaintiff was assigned as a culinary scullery worker on November 24, 2004, and began working that day. (Defts.' Ex. A-1 at 5.) The Culinary Roster shows plaintiff arrived at 5:45 a.m. (Defts.' Ex. D.)

7. Inmate Culinary Worker is an entry-level position and inmates must begin work at 4:00 a.m. Because the starting time is so early, half of the inmates are in non-paid positions, and the workers are constantly supervised, the turnover rate in culinary is high. (Defts.' Ex. E.) It is difficult to keep a full staff in culinary. (Id.)

8. For the safety and security of the institution, inmates assigned to the culinary must submit to a strip search in the work change area at the conclusion of their shifts. The

/////

1 kitchen contains knives and other metal utensils, and in an effort to control contraband, inmates
2 are required to "strip-out" prior to returning to the housing unit. (Defts.' Ex. E.)
3       9. Defendants contend there is a portable privacy screen in the work change area
4 to shield inmates who do not want to be viewed by other inmates. (Defts.' Ex. E.) Plaintiff
5 maintains that while plaintiff was working in culinary, there was no portable privacy screen
6 available or at least plaintiff was not made aware that there was a privacy screen available,
7 despite plaintiff's alleged complaint to Sgt. Halverson in December, 2004.
8       10. Plaintiff reported to work in culinary every day assigned in November, 2004.
9 (Defts.' Ex. F.) In December 2004, plaintiff reported sporadically, and by December 15, 2004,
10 plaintiff stopped reporting for work. (Defts.' Ex. F.)
11       11. Due to the high turnover of culinary workers, failure to report is treated more
12 leniently than it would be in other inmate work positions. (Defts.' Ex. E.) Prison staff would
13 attempt to work with the inmate rather than immediately submitting a CDC-115, Rules Violation
14 Report. (Defts.' Ex. E.)
15       12. After plaintiff failed to report to work for several days, culinary staff made
16 calls to plaintiff's housing unit to try to encourage plaintiff to return to work. (Defts.' Ex. E.) A
17 notation on the December Log Sheet shows that plaintiff "refused" to report. (Defts.' Ex. E.)
18       13. On January 9, 2005, Officer Curry wrote a Rules Violation Report against
19 plaintiff for failure to report to work. (Defts.' Ex. A-1 at 6-8; Defts.' Ex. E.) At the same time,
20 Sgt. Halverson authored an informative chrono requesting plaintiff's unassignment from the
21 position as a culinary worker. The chrono notes plaintiff was absent eight days in January, 2005.
22 (Defts.' Ex. A-1 at 9; Defts.' Ex. E.) Plaintiff states that although the CDC-115 may have been
23 written on January 9, 2005, it was not given to plaintiff until January 21, 2005. (Pl.'s April 10,
24 2007 Stmt. Undisputed Facts, at 1.)
25       14. On or about January 15, 2005, plaintiff spoke to Counselor Stubbs and told
26 him plaintiff did not feel safe working in the culinary because plaintiff was being harassed and

subjected to a hostile work environment. (Pl.'s April 10, 2007 Stmt. Undisputed Facts at 2.) Plaintiff contends Counselor Stubbs informed plaintiff that she was not required to work in culinary because of plaintiff's HIV status. (Id.)

Sgt. Halverson spoke with Counselor Stubbs regarding the request for plaintiff's unassignment. (Defts.' Ex. E.) Counselor Stubbs informed Sgt. Halverson that plaintiff claimed plaintiff did not feel safe in the culinary setting and therefore did not report to work. (Defts.' Ex. E.) Counselor Stubbs told Sgt. Halverson he believed plaintiff was upset because she was not assigned to school. (Defts.' Ex. E.)

15. Defendants contend that at no time prior to the conversation with Counselor Stubbs did plaintiff inform Sgt. Halverson that plaintiff felt unsafe, or that plaintiff was being harassed by other culinary workers. (Defts.' Ex. E.) However, plaintiff contends that in December 2004 plaintiff informed Sgt. Halverson that plaintiff was being sexually harassed due to being transgender with breasts and that plaintiff did not feel comfortable stripping naked in front of inmates and staff. (Pl.'s April 10, 2007 Stmt. Undisputed Facts, Decl., at 1-2.) Plaintiff contends Sgt. Halverson told plaintiff to talk to her counselor. (Id. at 2.) Plaintiff contends she also informed Sgt. Halverson she would not be returning to work. (Id.)

Plaintiff further contends that on the same day plaintiff complained to Sgt. Halverson, plaintiff sent a GA-22 Request for Interview to Counselor Stubbs via institutional mail, pursuant to Sgt. Halverson's suggestion, requesting plaintiff be reassigned from culinary. (Pl.'s April 10, 2007 Stmt. Undisputed Facts, Decl., at 1.) Plaintiff states no written response was received so plaintiff does not have the GA-22 form. (Id.)

While Sgt. Halverson was assigned as the Culinary Sergeant, three transgender inmates were assigned to culinary and none of them had problems with their work performances. (Defts.' Ex. E.) All three transgender inmates worked as lead workers, and reported to work on a regular basis. (Defts.' Ex. E.)

/////

16. Sgt. Halverson was not made aware that any transgender inmate had problems with harassment or victimization by other inmates who worked in the culinary. (Defts.' Ex. E.) If such problems had been brought to his attention, Sgt. Halverson would have investigated the allegations, and if he felt the allegations were legitimate, would have contacted the inmates' counselor and had the inmate be unassigned. (Defts.' Ex. E.) In such a situation, the inmate would receive "E"-time (excused time off) and would not lose work credits. (Defts.' Ex. E.)

17. On January 20, 2005, plaintiff appeared before the UCC for program review. (Defts.' Ex. A-1 at 10.) The committee noted plaintiff had participated in the work assignment without difficulty until January 2005. (Defts.' Ex. A-1 at 10.) Plaintiff claimed plaintiff had safety fears, but the committee found plaintiff had failed to address plaintiff's concerns with either Sgt. Halverson or Counselor Stubbs. (Defts.' Ex. A-1 at 10.) The committee placed plaintiff on C-Status and removed plaintiff from the work assignment. (Defts.' Ex. A-1 at 10.)

18. An inmate on C-status does not earn work credits. Cal. Code Regs. tit. 15, § 3044 (5)(A). The inmate remains in zero credit earning status until classified for placement in a credit qualifying work group. Cal. Code Regs. tit. 15, § 3044(5)(B). Thirty days after being placed on C-Status, the inmate can submit a written request to be removed from C-Status, and within 30-days, the inmate is scheduled for a hearing. Cal. Code Regs. tit. 15, § 3044(5)(B).

19. On January 25, 2005, plaintiff appeared for a hearing on the disciplinary violation. (Defts.' Ex. A-1 at 6-8.) Plaintiff was given a staff assistant, allowed to call witnesses, and to present evidence. (Defts.' Ex. A-1 at 6.) Plaintiff pled guilty to the charge of not reporting to work, and then refused to make any further statement. (Defts.' Ex. A-1 at 7-8.) Plaintiff was found guilty and assessed 30 days loss of behavioral credits. (Defts.' Ex. A-1 at 8.) Plaintiff was advised of the right to appeal. (Defts.' Ex. A-1 at 8.)

20. On February 17, 2005, plaintiff submitted a written request for consideration of removal from C-Status. (Defts.' Ex. A-1 at 11.) The request was not received by Counselor

/////

1  Stubbs until March 7, 2005. (Defts.' Ex. A-1 at 11.) On March 10, 2005, plaintiff appeared
2  before the UCC, which elected to remove him from C-Status. (Defts.' A-1 at 11.)

3        21.  Plaintiff was assigned as the T-Wing Assistant Lead Yard Attendant on
4  March 30, 2005, and remained in that assignment until November 30, 2005. (Defts.' Ex. A-1 at
5  12.)

6        22.  On January 15, 2005, plaintiff submitted a grievance protesting the
7  informational chrono issued by Sgt. Halverson. (Defts.' Ex. A-1 at 13-14.) Plaintiff claimed she
8  was being threatened by racist inmates. (Defts.' Ex. A-1 at 13.) Plaintiff also claimed plaintiff
9  was taunted by other inmates when strip searched after the shift. (Defts.' Ex. A-1 at 13-14.)
10 Plaintiff requested not to be put on C-Status and asked to be assigned to school. (Defts.' Ex. A-1
11 at 13.)

12       23.  The grievance was bypassed at the informal level of review. (Defts.' Ex. A-1
13 at 13.) On February 22, 2005, Associate Warden Cullen denied plaintiff's grievance, finding
14 plaintiff had been given the opportunity to discuss safety concerns with Officer Curry, the
15 culinary officer, but failed to do so. (Defts.' Ex. A-1 at 18-19.) Associate Warden Cullen also
16 noted that during the UCC hearing, the committee noted that plaintiff had failed to address safety
17 concerns with Sgt. Halverson. (Defts.' Ex. A-1 at 18.)

18       24.  Plaintiff submitted the grievance to the second level of review on March 2,
19 2005, claiming plaintiff wanted Sacramento to know that transgender inmates were being
20 mistreated. (Defts.' Ex. A-1 at 15-17.)

21       25.  On April 21, 2005, M. Veal signed the second level response to plaintiff's
22 grievance. (Defts.' Ex. A-1 at 20-21.) Veal noted that Sgt. Popovits had conducted a thorough
23 review of plaintiff's complaint, and that plaintiff's appeal was denied at the first level of review
24 because the UCC deemed plaintiff a program failure and placed plaintiff on C-Status. (Defts.'
25 Ex. A-1 at 20.) Veal also noted that plaintiff had been before the UCC for a program review,
26 /////

6

removed from C-Status, and put on the waiting list for placement in school. (Defts.' Ex. A-1 at 21.) On that basis, the appeal was partially granted at the second level. (Defts.' Ex. A-1 at 21.)

26. Plaintiff's grievance was denied at the Director's Level of review on August 1, 2005. (Defts.' Ex. A-1 at 22.) Plaintiff's request that informational chrono be removed from the central file was denied, with another notation that plaintiff had failed to present safety concerns to Sgt. Halverson. (Defts.' Ex. A-1 at 22.)

27. Plaintiff filed a grievance on February 24, 2005, requested that plaintiff be taken back to the classification committee and removed from C-Status. (Defts.' Ex. A-1 at 23-25.) Plaintiff claimed that Counselor Stubbs had refused plaintiff's request for UCC review in retaliation for plaintiff filing a sexual harassment claim against CDCR. (Defts.' Ex. A-1 at 23-25.) Plaintiff withdrew the grievance on March 10, 2005, the day plaintiff was taken off C-Status by the UCC. (Defts.' Ex. A-1 at 24.)

28. On March 28, 2005, plaintiff filed a grievance requesting that work credits be restored, and the release date be updated to April 2, 2007. (Defts.' Ex. A-1 at 26-27.) Plaintiff claimed that in exchange for dropping the grievance, the UCC told plaintiff all of the credits would be restored. (Defts.' Ex. A-1 at 26-27.)

29. The appeal was denied at the informal level of review on April 6, 2005. (Defts.' Ex. A-1 at 26.) Plaintiff was reminded plaintiff was on C-Status from January 20, 2005 through February 23, 2005,[3] and that plaintiff was not earning credits. (Defts.' Ex. A-1 at 26.)

30. Plaintiff did not appeal the decision further and, to date, plaintiff's work credits have not been restored.

/////

---

[3] The CDC-128G form from the March 10, 2005 UCC program review reflects that plaintiff was placed on C-Status on January 20, 2005 as a result of his failure to participate in the Inmate Work Incentive Program, specifically his assignment to culinary, and that the committee removed plaintiff from C-Status effective February 24, 2005. (Defts.' Ex. A-1 at 11.) Plaintiff was therefore on C-Status from January 20, 2005 through February 23, 2005, a period of 35 days.

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 US. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

/////

On January 12, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

## ANALYSIS

### 1. Deprivation of Good Time Credits and Related Due Process Violation

Plaintiff alleges he was denied six months of good time credits after a prison disciplinary hearing where he was placed on C-Status. (Complaint at 3.) Defendants seek summary judgment on the ground that plaintiff's claim implicates the validity of a disciplinary conviction that has not been set aside.

In Heck v. Humphrey, 512 U.S. 477 (1994), the United States Supreme Court held that a suit for damages on a civil rights claim concerning an allegedly unconstitutional conviction or imprisonment cannot be maintained absent proof "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." Heck, 512 U.S. at 486. Under Heck, the court is required to determine whether a judgment in plaintiff's favor would necessarily invalidate his conviction or sentence. Id. If it would, the claim must be dismissed unless the plaintiff can show that the conviction or sentence has been invalidated.

In Edwards v. Balisok, 520 U.S. 641 (1997), the United States Supreme Court extended the rule of Heck to claims involving prison disciplinary proceedings that resulted in the loss of good-time credits. Where such claims, if successful, would implicate the validity of the deprivation of good-time credits, they must be dismissed unless the disciplinary conviction has been invalidated or the good time credits have otherwise been restored. The Court's reasoning in Heck and Edwards, when read together, make it clear that a 42 U.S.C. § 1983 claim is not cognizable where (a) the plaintiff seeks damages bearing a relationship to a conviction that

would necessarily imply the invalidity of the underlying conviction where that conviction has not been reversed, expunged, declared invalid or called into question, <u>Heck</u>, 512 U.S. at 486, or (b) the plaintiff seeks damages challenging the procedures employed in a disciplinary hearing depriving a prisoner of good-time credits.  <u>Edwards</u>, 520 U.S. at 648-49.

Like the prisoner plaintiff in <u>Edwards</u>, plaintiff in the instant case alleges the procedures used in his disciplinary proceeding violated his due process rights, resulted in the wrongful denial of good time credits, and sought damages therefor.  Accordingly, because these claims are based on said disciplinary conviction, they must be dismissed without prejudice.  See <u>Trimble v. City of Santa Rosa</u>, 49 F.3d 583, 585 (9th Cir.1995) (per curiam).[4]

2. Eighth Amendment Violations

Plaintiff alleges that defendants Popovits and Stubbs threatened and harassed him because he refused to withdraw his administrative appeals.  Plaintiff also alleges that other culinary workers harassed plaintiff by making sexual comments during mandatory strip searches. Plaintiff does not address the Eighth Amendment violations in the April 10, 2007 opposition to the motion for summary judgment.  Defendants argue that plaintiff has failed to state a claim under the Eighth Amendment.

The Eighth Amendment, which the Supreme Court has extended to the States, prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Prison officials may be liable under the Eighth Amendment for the assault of a transsexual inmate by another inmate if the officials knew that the victim faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to prevent it.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).  The Eighth Amendment, however, "does not mandate comfortable

/////

---

[4] Moreover, the evidence provided by defendants demonstrates plaintiff was deprived of 35 days of good time credits, not six months as alleged in the complaint. (Defts.' Ex. A-1 at 11.) Plaintiff has provided no evidence in rebuttal.

prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), and does not provide relief for perceived acts of negligence on the part of prison officials.

An allegation of mere threats alone fails to state a claim of cruel and unusual punishment under the Eighth Amendment. Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987); see Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (neither verbal abuse nor the use of profanity violate the Eighth Amendment).

Plaintiff's allegations under the Eighth Amendment, without more, do not raise a cognizable civil rights claim. "Standing alone, simple verbal harassment does not . . . deprive a prisoner of a protected liberty interest." DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000.) Accordingly, plaintiff's Eighth Amendment claims should be dismissed for failure to state a claim.

3. Hostile Work Environment

In the unverified complaint, plaintiff, a transgender inmate, claims she was subjected to a hostile work environment:

> On or about November 24, plaintiff was assigned to a culinary work assignment which requires plaintiff to strip naked in front of male inmates and staff routinely at least twice a day, and which is a very hostile environment for transgenders. [¶] Plaintiff was immediately subjected to sexual harassment being called "gay ass punk," "gay nigger," "HIV nigger with breast," "AIDS punk from Unit 4," and threats of violence.

(Complaint at 1.) Plaintiff contends another transgender culinary worker, Tracy Daniels, had recently been physically attacked by culinary workers. (Id.) In her opposition to the motion for summary judgment, plaintiff fails to address defendants' arguments concerning this claim. In the accompanying declaration, plaintiff declares under penalty of perjury that while she was working in culinary there was no portable privacy screen available or at least she was not made aware that there was such a screen available despite her complaint to Sgt. Halverson in December 2004. (April 10, 2007 Decl. at 1.) Plaintiff has provided no other evidence or argument to rebut defendants' motion on this claim.

Defendants contend that plaintiff cannot establish a prima facie case for sexual harassment or hostile work environment under Title VII because a prisoner is not an employee for purposes of that statute.

An employee is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f). "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, . . . ." 42 U.S.C. § 2000e(b). The most important factor in Title VII cases is determining whether an employment relationship exists. Baker v. McNeil Island Corrections Ctr., 859 F.2d 124, 128 (9th Cir. 1988)(finding that pro se inmates employed in work release or training programs are covered by Title VII). The Baker court did not find that other inmate workers, not assigned to work release or training programs, are covered by Title VII.

"[T]he economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary. Hale, 993 F.2d at 1395."[5] Coupar v. United States Dept. of Labor, 105 F.3d 1263, 1265 (9th Cir. 1997)(inmates are not employees for purposes of the "whistleblower" provisions of the Clean Air Act, 42 U.S.C. § 7622, and the Toxic Substance Control Act, 15 U.S.C. § 2622).

> Title VII protections apply only where there is some connection with an employment relationship. Lutcher, 633 F.2d at 883. The connection need not necessarily be direct. It can encompass a defendant who is subject to Title VII and who interferes with an individual's employment opportunities with another employer. Id. & n.3.

Baker, 859 F.2d at 128.

---

[5] Hale v. Arizona, 993 F.2d 1387, 1393 (9th Cir.) (en banc), cert. denied, 510 U.S. 946 (1993)(inmates are not "employees" for the purpose of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq.).

In the instant action, plaintiff was employed as a culinary worker. Plaintiff was not employed in a work release or training program. Therefore, plaintiff's position was penological, not pecuniary. Plaintiff has presented no evidence to the contrary. In addition, plaintiff alleges that it was other inmates who were verbally harassing plaintiff. Therefore, this case is distinguishable from <u>Baker</u>, where it was a paid state library worker who was interfering with Baker's ability to obtain a paid position in the library. On this record, defendants are entitled to summary judgment on this claim.

4. Violation of HIPAA

Plaintiff opted to oppose defendants' motion for summary judgment on the sole ground that defendants' motion allegedly violated the Health Insurance Portability and Accountability Act ("HIPAA"). Plaintiff contends her health information is confidential and that defendants failed to comply with HIPAA prior to accessing her medical and mental health records and filing 18 pages of those records now available to the public.

Plaintiff is correct that her medical records are confidential. California Civil Code § 56.10(a) provides that

> No provider of health care, health care service plan, or contractor shall disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization, except as provided in subdivision (b) or (c).

<u>Id.</u> However, state law provides that in the event of a lawsuit, such records may be obtained without the patient's specific authorization:

> (8) A provider of health care or health care service plan that has created medical information as a result of employment-related health care services to an employee conducted at the specific prior written request and expense of the employer may disclose to the employee's employer that part of the information that:
>
> (A) Is relevant in a lawsuit, arbitration, grievance, or other claim or challenge to which the employer and the employee are parties and in which the patient has placed in issue his or her medical history, mental or physical condition, or treatment, provided that information may only be used or disclosed in connection with that proceeding.

14

1  Cal. Civil Code § 56.10(8).  In addition, federal courts have found that HIPAA created no private

2  right of action.  <u>University of Colorado Hosp. v. Denver Publ'g Co.</u>, 340 F.Supp.2d 1142, 1145

3  (D.Colo. 2004); <u>O'Donnell v. Blue Cross Blue Shield of Wyoming</u>, 173 F.Supp.2d 1176, 1180

4  (D. Wyo. 2001).

5             In the instant action, the records provided by defendants were relevant to the civil

6  rights complaint initiated by plaintiff.  Plaintiff therefore waived her right to confidentiality when

7  she brought the instant action.  However, because the records provided by defendants included

8  mental health records, the court will direct the Clerk of the Court to remove exhibit B from

9  defendants' October 26, 2006 motion for summary judgment and file them under seal.

10            Good cause appearing, IT IS HEREBY ORDERED that the Clerk of the Court

11 remove exhibit B, consisting of 18 pages, from defendants' October 26, 2006 motion for

12 summary judgment (Docket No. 28 at 32-51), and file them under seal.

13            Accordingly, IT IS HEREBY RECOMMENDED that defendants' October 26,

14 2006 motion for summary judgment be granted.

15            These findings and recommendations are submitted to the United States District

16 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty

17 days after being served with these findings and recommendations, any party may file written

18 objections with the court and serve a copy on all parties.  Such a document should be captioned

19 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

20 failure to file objections within the specified time may waive the right to appeal the District

21 Court's order.  <u>Martinez v. Ylst</u>, 95 1 F.2d 1153 (9th Cir. 1991).

22 DATED:  May 7, 2007.

23

24                                          UNITED STATES MAGISTRATE JUDGE

25

26   /001; samu2337.msj